TEITIG ET AL., RESPONDENTS, *v.* BOESMAN BROTHERS AND COMPANY, APPELLANTS.

[Submitted April 2, 1892. Decided July 29, 1892.]

PRACTICE— *Copy of written instrument and answer —When deemed admitted — Replication.* —The provision of section 98 of the Code of Civil Procedure that where a defense to an action is founded upon a written instrument, and a copy thereof is contained in the answer, or annexed thereto, its genuineness and due execution are deemed admitted unless the plaintiff file and serve upon the defendant an affidavit denying the same, is not rendered inapplicable because the Code of Civil Procedure also provides for a replication by which the plaintiff may deny new matter contained in the answer.

SAME— *Pleading— Copy of written instrument in answer—When deemed admitted.* —Where an attack is made upon a written instrument as fraudulent and void, by the averment in the complaint of facts outside of the instrument, which if proved would establish the charge, and the answer denies such facts and exhibits a copy of the writing attacked, neither the action or defense is based upon the written instrument, but upon the facts *dehors* the instrument by which its good faith is respectively *attacked* and *defended,* and, therefore, not within section 98 of the Code of Civil Procedure, providing when the genuineness and due execution of a written instrument upon which a defense is founded is deemed admitted.

CORPORATIONS— *Mortgages and deeds of trust—Assignments—Affidavits of good faith.* —Section 1555, fifth division of the Compiled Statutes, requiring that all mortgages or deeds of trust of both real and personal property by a corporation must be accompanied by an affidavit of the president, secretary, or managing agent, that the same is made in good faith, and without any design to hinder or delay creditors, relates to mortgages or deeds of trust partaking essentially of

the nature of a mortgage where no actual change of posssesion accompanies the transaction, and is not applicable to assignments or transfers of both real and personal property by a corporation where actual delivery of possession accompanies the conveyance, even though such conveyance and delivery of possession was in trust to convert the property into money, and pay the debts of the corporation.

SAME — *Stockholders — Solvency.* — The fact that none of the persons about to form a company to engage in mercantile business were possessed of money or property with which to start such business, or buy an interest therein, does not alone justify a finding that they were at that time insolvents.

SAME — *Assignments — Frauds — Evidence.* — Evidence that a creditor, to whom an assignment was made by an insolvent corporation, had sold the corporation, on credit, the goods on which it commenced business ; that he had suggested organizing the corporation, but was not a stockholder, and was familiar with its business only in a general way ; that he had nothing to do with the management of the corporation, but made suggestions from time to time ; that during the last two months he knew the amount of the indebtedness and the financial condition of the company from examination of its books, and insisted upon a change in its business policy for the better, which was not adopted, does not justify a finding and conclusion that such creditor had, and exercised, control of the affairs of said corporation during its business career, so as to place him in the same relation to the corporation as its trustee and managing officer.

SAME — *Same — Same — Same.* — Nor would such facts, coupled with evidence that such creditor had agreed to lend the corporation his credit, by indorsement or loan, for a limited amount, which he fulfilled, justify a finding that the corporation secured, solely on account of the solvency and indorsement of such creditor, credit upon which it could do business, thereby giving to the corporation a credit wholly fictitious, in the absence of any evidence tending to show that he had in some way influenced or misled the judgment creditor to extend credit to the corporation, or that they ever sought from him information concerning the financial condition of the corporation, or to what extent he could be relied upon in aiding it to meet its liabilities.

SAME — *Same — Same — Secret agreement between creditor and insolvent company.* — An agreement between the manager of the defendant company and a creditor, made about the time the company was organized, in consideration of the goods furnished by the creditor to the company, on credit, upon which it commenced business, and the promise of an additional loan if needed, that should the corporation become involved, or be sued for any indebtedness, any notes that such creditor might hold against the company, should become immediately due unless secured, though kept secret and followed by an assignment to such creditor, preferring his claim, does not operate as a fraud upon creditors, in the absence of any circumstances indicating a fraudulent intent.

SAME — *Organization — Liability to third persons — Assignment — Validity — Corporate seal.* — In the case at bar it appeared that the defendant corporation was organized by three persons, who filed the usual certificate of incorporation, naming themselves as trustees for the first three months ; that all the stock issued was taken by such incorporators, who thereupon held a meeting and elected themselves officers ; that thereafter no regular meeting of stockholders or trustees was ever held, but all such persons jointly managed the business of the company until one withdrew therefrom, leaving the other two in charge of the company and sole owners of its property. No third trustee was ever supplied, nor was any annual report ever filed, as required by sections 450 and 460, fifth division of the Compiled Statutes. *Held,* that as to third persons, the trustees, by reason of such delinquency, became liable as copartners, and by

reason of all the joint owners being in actual possession and management of the property and business, and disregarding the regulations as to corporations, the company became merely a joint proprietorship, with the joint owners in possession of its property, and such absolute ownership and possession gave power of disposition. *Held, also,* that an assignment of the company property, made in good faith, in the company's name, executed by all such joint owners, would be sustained, although not authorized by any regular meeting of the so-called stockholders or trustees, and the seal affixed thereto had never been adopted as the corporate seal, and although one joint owner signed the instrument as "secretary," who had never been elected as such.

*Appeal from First Judicial District, Lewis and Clarke County.*

Action brought under section 356, chapter xi. of the Code of Civil Procedure, relating to proceedings supplementary to execution, and authorizing suit to be brought by judgment creditors against a person indebted to judgment debtor. Judgment was rendered for plaintiffs below by HUNT, J., and BUCK, J., sitting concurrently. Reversed.

Statement of the facts prepared by the judge delivering the opinion.

It appears that in October, 1888, a corporation was organized under the laws of Montana, in the name of Boesman Bros. & Co., for the purpose, as set forth in its certificate of incorporation, of "conducting and carrying on a general liquor business, such as dealing, at wholesale or retail, in beer, wine, liquor, mineral water, tobacco and cigars, and the importing and bottling of all kinds of mineral water, beer, wine, and all kinds of liquors." That three brothers, named, respectively, Charles, Henry, and Richard Boesman, were the incorporators of said company, as shown by said certificate; and the same persons were named therein as trustees to manage the concerns of said company for the first three months of its existence. That the capital stock of said company, stated in said certificate, was $10,000. That said company entered upon the conduct of said business, and continued to carry the same on until June 12, 1890, when it made and executed an alleged assignment, and delivered possession of all its property therewith to defendant, Reinhold H. Kleinschmidt, in trust, for the purpose of converting the same into money, and therewith to pay its debts, as directed in the assignment, the creditors of said company being set forth in the five several lists, or classes, which lists were

attached to said assignment; and the assignment directed payment of said creditors in the order as thus classified. That defendant Kleinschmidt was among the creditors of said company in the first class, to the extent of about $10,907, and the Union Warehouse Company, of which defendant Kleinschmidt was president, appears as creditor of said company in the second class of creditors, to the amount of $13,750. That at the time of said assignment and delivery of said property to Kleinschmidt, the plaintiffs in this action were severally creditors of said company in various sums, ranging from about $100 to about $1,500, respectively. That said creditors, who now appear as plaintiffs in this action, each severally brought suit against said company, obtained process for the attachment of the property of said company, and served on defendant Kleinschmidt, who was then in the possession of said property formerly owned by said company, a process of garnishment. That said Kleinschmidt made answer to each of said garnishments substantially as follows: "In reply to the garnishment in the above entitled action, I hereby make return that I am the assignee of Boesman Bros. & Co., and that all the property which I have in my possession is subject to the provisions of the assignment made to me by the said Boesman Bros. & Co., and I have not in my hands any property whatever subject to levy as the property of said corporation of Boesman Bros. & Co., nor am I indebted to said corporation in any sum whatever." That replies were made by said creditors to the answer of Kleinschmidt to said several processes of garnishment, controverting the allegations thereof; whereupon an order was made by the court requiring said garnishee Kleinschmidt to appear and answer, under oath, concerning the same, which was complied with. That judgments were obtained in due course by each of these plaintiffs against the defendant, Boesman Bros. & Co.; and such proceedings were had that an order was made in each of said cases directing an action to be brought by the parties in interest against said garnishee Kleinschmidt, under the provisions of section 356 of the Code of Civil Procedure, to contest his claim upon said property, which he had in his possession, and claimed the right to hold under and by virtue of said assignment. This action was brought pursuant to that order.

The complaint sets forth the facts concerning the bringing of said actions by the several plaintiffs against Boesman Bros. & Co., the procurement of the attachment process, services of garnishment on Kleinschmidt, his answer, the reply controverting said answer, the order of the court requiring him to appear and be examined in supplemental proceeding, the obtaining of the several judgments in those actions against Boesman Bros. & Co., and the order of the court directing this suit to be brought. Having set forth those allegations, it is alleged in the complaint that "said Boesman Bros. & Co. is, and for a long time past has been, insolvent, and has not any property of any kind except the property taken and held by defendant Kleinschmidt, and, unless this property is subject to plaintiffs' claims, they will be without remedy and without means to enforce their said judgments." Paragraph 24 alleges as follows: "That the answer of said Kleinschmidt to each of the said attachments was and is false and untrue, and that said pretended assignment under which said defendant Kleinschmidt claims said property is illegal, fraudulent, and void, in that, among other things, it was executed without authority of law, and without authority of said corporation, and was procured by said Kleinschmidt for the purpose of hindering, delaying, and defrauding the creditors of said Boesman Bros. & Co., and particularly these plaintiffs." The foregoing paragraph was amended after the trial commenced, by permission of court, as shown below, upon the allowance of which amendment error is assigned. It is further alleged in the complaint that the said pretended assignment directed the payment of a large sum of money to defendant Kleinschmidt as one of the preferred creditors — a sum sufficient to absorb the entire assets of said Boesman Bros. & Co.— which pretended indebtedness is fraudulent, false, and fictitious, and the said assignment so directs said payment for the purpose of defrauding all other creditors, particularly these plaintiffs; that said Kleinschmidt was instrumental in organizing said corporation of Boesman Bros. & Co., and caused it to be organized for his own use and purpose, and directed and managed its affairs, and was at all times cognizant of the condition of said corporation, and, knowing that said Boesman Bros. & Co. had purchased a large quantity of goods

and merchandise, and was owing large amounts therefor, he procured said pretended assignment for the purpose of defrauding said creditors, and particularly these plaintiffs; that at the time said writs of attachment and notices were served on defendant Kleinschmidt, he had in his possession, and now has in his possession, a large amount of money, credits, and other valuable property belonging to the said Boesman Bros. & Co., all of which said property was and is subject to plaintiff's said attachments and executions, and the right to subject the same to the payment of their said claims. Wherefore plaintiffs demand judgment, annulling said assignment; that defendant Kleinschmidt be required to account for and pay into court all moneys and other effects received by him from said company; that a receiver be appointed to take charge of said property, and convert the same into money, and apply such money to the payment of said judgments rendered in favor of these plaintiffs, in the order of the several alleged liens acquired by said garnishment processes.

To this complaint Kleinschmidt made answer, specifically denying the allegations thereof, except the service of the several processes of garnishment, and his answer thereto. He denied the validity of said processes and other allegations as to the due and regular prosecution of said actions, and the obtaining of the processes therein obtained. And further answering said complaint, by way of new and affirmative matter of defense, alleged: "That on or about the twelfth day of June, 1890, the corporation of Boesman Bros. & Co. duly made, executed, and delivered to this defendant its deed of assignment in writing, wherein and whereby it transferred to this defendant all of its property, of every kind and character whatsoever, in trust for the benefit of its creditors, which said assignment, and the trust therein, were duly accepted by this defendant, in writing therein, and was thereupon duly recorded in the office of the county recorder of the county of Lewis and Clarke, State of Montana, a copy of which assignment, with the indorsement thereon, is hereto attached, and hereof made a part, marked 'Exhibit A;'" that immediately upon the delivery of said assignment, said Boesman Bros. & Co. delivered to this defendant the actual possession of all its personal property, real estate, choses in

action, credits, and effects of every kind and character, and this defendant received the actual possession thereof from said company, and held the same in his possession until disposed of as hereinafter set forth; that as speedily as possible this defendant converted said property into cash, and applied the same to the payment of the indebtedness of said corporation, in accordance with the terms of said assignment; that the amount realized by him from all said property is the sum of $10,611.34; that he has disbursed said sum to the creditors of said assignor, in accordance with the terms of said assignment, as follows:—

| | | |
|---|---:|---:|
| R. H. Kleinschmidt | $4,957 | 72 |
| First National Bank of Helena, Montana | 476 | 45 |
| H. S. Magraw | 45 | 32 |
| Montana Park & Hotel Society | 422 | 21 |
| J. Doerr | 121 | 69 |
| H. Baumgart | 111 | 79 |
| Henry Kleinschmidt | 44 | 96 |
| Jacob Surtzes | 77 | 30 |
| J. Gerlach | 21 | 26 |
| P. Hochberh | 32 | 95 |
| Montana National Bank | 22 | 04 |
| Cullen, Sanders & Shelton | 200 | 00 |
| Tom Huig | 15 | 68 |
| Phillip Huith | 17 | 00 |
| And in addition thereto paid out for clerk hire and other necessary expenses in the business, as appears by an account of the same hereto attached, marked "Exhibit B," and hereof made a part | 4,004 | 97 |

That long prior to the commencement of this action, and long prior to any proceedings herein, all property of said Boesman Bros. & Co. has been applied by this defendant upon the indebtedness of said corporation, as above set forth; that said corporation was indebted at the time of said assignment to this defendant, individually, in the sum of $10,907.67; that he applied on said indebtedness the sum of $4,957.72, being all the assets remaining in his hands after payment of the credits above set forth; that there is still due him the sum of $5,949.95, for which he has no security, and no assets with which to pay the

same; that certain creditors (named in the answer and in the foregoing list of payments) have received and accepted from this defendant the sums due them on this assignment, and in accordance with the provisions thereof. Wherefore defendant demands that he be dismissed from this litigation, with his costs expended herein.

To said answer is annexed an itemized account of defendant's disbursements mentioned in the answer as "Exhibit B," and also a copy of the assignment alleged in said answer to have been "duly made, executed, and delivered to this defendant by said corporation."

A replication was filed by plaintiffs denying on information and belief that said Boesman Bros. & Co. executed and delivered to defendant Kleinschmidt its deed of assignment, in writing or otherwise, wherein it transferred its property of every kind and character for the benefit of its creditors; and denied on information and belief that the pretended assignment attached to the answer was executed by authority of Boesman Bros. & Co., or that the person who pretended to sign said instrument had any authority to act and sign for said company; denied on information and belief delivery of said property by said company to Kleinschmidt, or that Kleinschmidt had paid the same to the creditors of Boesman Bros. & Co., or had authority to so pay the same; and denied on information and belief that said company was indebted to defendant Kleinschmidt in the sum of $10,907.67, or in any other sum whatever. The plaintiffs assert in their reply that as to the allegations of defendant Kleinschmidt, that he sold the property of said Boesman Bros. & Co., plaintiffs had no knowledge sufficient to form a belief, but allege "that several orders of the court were made prohibiting Kleinschmidt from selling said property until he executed satisfactory bond to secure the payment of certain claims of plaintiffs, and that said Kleinschmidt has not complied with said orders in furnishing said bond."

When the trial of the cause commenced, plaintiffs attempted to introduce evidence to show that said assignment was not duly executed by said corporation, in that it was not executed by authority of said corporation, and with due and legal formality by the officers and agents thereof, so as to make it the genuine

act of said company, to the introduction of which evidence
defendant objected, on the ground that there is no issue made
by the pleadings in this case as to the "genuineness or due exe-
cution of the assignment, of which a copy is attached to the
answer of defendant," and that all testimony as to this question
is irrelevant and immaterial under the pleadings; which objec-
tion was by the court sustained. At this juncture counsel for
plaintiffs filed an affidavit setting forth certain facts which
plaintiffs desired and intended to prove in the trial of said
action, and asked leave of court to allow an amendment to the
twenty-fourth subdivision of the complaint. Said affidavit sets
forth that "plaintiffs intend to introduce evidence at the trial of
said action and prove that the answer of said Kleinschmidt to
each of the attachments mentioned in the complaint was and is
false and untrue, because said Boesman Bros. & Co. never did
execute or deliver any assignment to said Kleinschmidt, nor de-
liver to him this property, as set forth by said Kleinschmidt in
his answer to said attachment, or otherwise; that said pretended
assignment, under which said Kleinschmidt claims said prop-
erty, is illegal, fraudulent, and void, because the said pretended
assignment dated on the twelfth day of June, 1890, was not
executed or delivered to said Kleinschmidt, or any other person
for him, by said Boesman Bros. & Co., and because the trustees
of said company never did, by vote or otherwise, or in any
manner, direct the trustees or officers of said corporation, or any
of them, or any person, to execute or deliver the said pretended
assignment to said Kleinschmidt, or any other person; and
because the said pretended assignment dated on the 12th of
June, 1890, nor any other assignment, was ever executed or
delivered by the said corporation, or its officers, or trustees, or
any of them, nor was said property mentioned in said pretended
assignment, or any of the same, delivered to the said Klein-
schmidt, or any person for him, by said corporation, its officers
or trustees, or any of them; and for the further reason that the
said pretended assignment, and the taking possession of said
property by said Kleinschmidt, were never assented to or rati-
fied by said corporation, its trustees, or any of them; and for
the further reason that said corporation or its trustees never
did, by vote or otherwise, adopt a corporate seal, and never did,

by vote or otherwise, authorize or direct any person to devise, make, or use a corporate seal for said corporation, and never used a corporate seal; and that said pretended assignment was not executed in conformity with the law, because it does not contain the affidavit required by section 1555, fifth division of the Compiled Statutes of Montana."

With said affidavit was offered the proposed amendment of the complaint, as follows:—

"Now come the plaintiffs, and by leave of court first had and obtained file this amendment to their complaint, in lieu of subdivision twenty-four, and therein allege:—

"That the answer of said Kleinschmidt to each of said attachments was and is false and untrue, because the said Boesman Bros. & Co. never did execute or deliver any assignment to said Kleinschmidt, nor deliver to him its property as set forth by said Kleinschmidt in his answer to said attachment, or otherwise.

"That the said pretended assignment under which said Kleinschmidt claims said property is illegal, fraudulent, and void, because the same—that is, said pretended assignment dated on the twelfth day of June, 1890—was not executed or delivered to said Kleinschmidt, or any person for him, by said Boesman Bros. & Co.; and because the trustees or stockholders of said corporation never did, by vote or otherwise, authorize, or in any manner direct, the officers or trustees of said corporation, or any of them, or any person, to execute or deliver the said pretended assignment, or any other assignment, to said Kleinschmidt, or any other person; and, further, because said pretended assignment dated on the twelfth day of June, 1890, nor any other assignment, was ever executed or delivered by the officers or trustees of said corporation, or any of them, nor was said property mentioned in said pretended assignment, or any of the same, delivered to said Kleinschmidt, or any other person for him, by said corporation, its officers, trustees, or stockholders, or any of them; and for the further reason that said pretended assignment, and the taking possession of said property by said Kleinschmidt, were never assented to or ratified by said corporation, its trustees, officers, or stockholders, or any of them; and for the further reason that said corporation, or its trustees or stock-

holders, never did, by vote or otherwise, adopt a corporate seal, and never did, by vote or otherwise, authorize or direct any person to devise, make, or use a seal for said corporation, and never used a corporate seal; and for the further reason that said pretended assignment is not executed in conformity with the law because the same does not contain the affidavit required by section 1555, fifth division of the Compiled Statutes of Montana.

"And further allege: That the pretended assignment was procured by said Kleinschmidt for the purpose of hindering, delaying, and defrauding the creditors of said Boesman Bros. & Co., and particularly these plaintiffs."

Defendant Kleinschmidt objected to the allowance of said amendment on several grounds, among which was the objection that the effect thereof is to radically change the issues from those already formed by the original pleadings; and, further, that there is neither evidence nor other matter before the court at this time authorizing the allowance of said amendment, or to justify the same; and, further, that such amendment is an effort to avoid the requirement of section 98 of the Code of Civil Procedure, which has not been observed by plaintiffs. The objection of defendant to said amendment was overruled by the court, and said amendment as offered was allowed to be incorporated in the complaint, to which ruling defendant Kleinschmidt excepted; and, expressly reserving and saving all objections and exceptions to the allowance of said amendment, he denied the allegations thereof.

The trial then proceeded, and at the close thereof the court made its findings of facts, all of which, except findings numbered from 14 to 20 inclusive (being merely formal findings as to the plaintiffs obtaining judgment against defendant Boesman Bros. & Co., and the processes used in said actions), are material to the consideration of the questions raised on this appeal, and are therefore inserted in this statement of the case, without abridgment, as follows: —

"This cause coming on for trial, the parties appearing by their respective counsel, and the jury having been expressly waived, the cause was tried before the court, without a jury, both judges of the court sitting concurrently; and the testimony

having been submitted, and the briefs of counsel thereon, and the court, being fully advised in the premises, now finds the following facts:—

"1. That on the first day of October, 1888, a certificate of incorporation was filed in the office of the clerk and recorder of the county of Lewis and Clarke, and a duplicate was filed in the office of the secretary of the Territory of Montana, which certificate was filed to form the corporation of Boesman Bros. & Co.

"2. That Charles Boesman, Henry Boesman, and Richard Boesman, were named in said certificate of incorporation as the trustees of said corporation of Boesman Bros. & Co. for the first three months.

"3. That thereafter the persons so named as trustees held a meeting, at which Charles Boesman was elected president, Henry Boesman secretary, and Richard Boesman was elected treasurer, and no change was ever made in said board of trustees or officers.

"4. That no other meeting of the persons so designated as trustees was ever held, and no meeting of the stockholders of the said incorporation was ever held.

"5. That shares of, stock in said corporation were issued to said Henry Boesman, Charles Boesman, and Richard Boesman, and to no one else. That at the time of the issuance of said shares of stock, and at all times subsequent thereto, said Boesmans were each and all of them insolvent; and that the only property acquired by said corporation to represent its capital stock at the time of its organization were goods supplied them by Reinhold H. Kleinschmidt and the Union Warehouse Company, of which he, Kleinschmidt, was president, and of whose affairs he had the management. That at the times said goods were furnished them as aforesaid, the said R. H. Kleinschmidt, acting in behalf of himself and the Union Warehouse Company, took individual notes from the said Boesman brothers in payment of said goods. That a short time thereafter the individual notes of said Boesman brothers were surrendered by said R. H. Kleinschmidt and the Union Warehouse Company, in exchange for a note or notes for the aggregate amount of said individual notes, which was executed and delivered by the corporation of Boesman Bros. & Co.

"6. That about the time said corporation was organized, the defendant Kleinschmidt, as president of the Union Warehouse Company, and individually, entered into an agreement (Exhibit C) with the persons named as trustees in said certificate of incorporation, whereby it was agreed that any paper of said Union Warehouse Company, or the defendant Kleinschmidt, held against Boesman Bros. & Co., should become immediately due and payable if said Boesman Bros. & Co. should become involved, or be sued on any indebtedness, unless said Boesman Bros. & Co. would immediately secure Kleinschmidt.

"7. That said agreement was kept secret between said Kleinschmidt and said Boesmans.

"8. That said corporation was organized at the suggestion and instigation of said Kleinschmidt; that all the time said corporation was transacting business he had full knowledge and control of its affairs, and exercised such control; and that said corporation was enabled to secure, and did secure, solely on account of the solvency and indorsement of the said R. H. Kleinschmidt, credits upon which it could do and did do business.

"9. That said corporation became indebted to plaintiffs in this action, and to divers other persons, in large amounts, all of which was well known to said Kleinschmidt.

"10. That on the twelfth day of June, 1890, Charles Boesman and Richard Boesman, while under the control and under the direction of defendant Kleinschmidt, signed an instrument purporting to convey to said Kleinschmidt the property of said Boesman Bros. & Co., in trust for the benefit of the creditors of said corporation, which said instrument is hereby referred to and made a part of this finding.

"11. That said Kleinschmidt made out the list of creditors, and directed the order in which they should be paid; which list was embodied in said instrument, and said Kleinschmidt and said Union Warehouse Company were among the first preferred creditors for large amounts.

"12. That said Kleinschmidt took into his exclusive possession and received the property of said Boesman Bros. & Co., which property was worth more than the sum of $13,000.

"13. That the said persons named as trustees in said certificate, or the stockholders of said Boesman Bros. & Co., never

did, by corporate resolution or otherwise, direct or request the said Charles Boesman, or Richard Boesman, or any other person, to sign and execute said instrument, or any other instrument, to convey all its property to said Kleinschmidt, or to any other person, and never did, by corporate resolution or otherwise, ratify, adopt, approve, or confirm said instrument, or ratify or consent to the taking of said property by said Kleinschmidt.

"21. That at the time said pretended assignment was made the said Boesman Bros. & Co. was indebted to these plaintiffs in this action, and to divers other persons in large sums. That at the time the defendant Kleinschmidt procured said instrument, the said Boesman Bros. & Co. was, and ever since has been, and now is, insolvent, and, at the times the several writs of attachment were issued and served on the said Kleinschmidt, the said Boesman Bros. & Co. did not have, and never since have had, any property subject to levy and execution, except the property which was taken by and held in the possession of said Kleinschmidt.

"22. That the preferred claims mentioned in said pretended assignment exceed in amount the total value of the assets of the said corporation, and the plaintiffs in this action were not among the preferred creditors, and under the provisions of said pretended assignment would not receive any payment whatever.

"23. That the pretended deed of assignment is not accompanied by the affidavit of the defendant Kleinschmidt, and the president, secretary, or managing agent of the corporation of Boesman Bros. & Co., stating that the same was executed in good faith, and not for the purpose of hindering, delaying, or defrauding the creditors of said Boesman Bros. & Co., as required by section 1555 of the Compiled Statutes of Montana."

Thereupon the court stated its conclusions of law, to the effect that by reason of the connection of defendant Kleinschmidt with Boesman Bros. & Co., "and his action in organizing said corporation, and controlling its affairs, gave to such corporation a credit wholly fictitious, and in violation of the laws of Montana relating to corporations and the management of the same; that by reason of his acts aforesaid, said Kleinschmidt stood in the same relation to said corporation as its trustee and managing officer; that the secret agreement between

said Kleinschmidt and the Boesmans, and the attempt of
defendant Kleinschmidt to procure an assignment from said
Boesman Bros. & Co., to carry out the provisions of said secret
agreement, and the procurement of the pretended assignment
on the part of said Kleinschmidt, operated as a fraud upon the
other creditors of said Boesman Bros. & Co.; that the said pre-
tended assignment was fraudulent and void as to the creditors
of Boesman Bros. & Co., and is not, and never was, of any
validity; that said assignment is also void for lack of an affi-
davit required by sections 1538 and 1555 of the fifth division,
Laws of Montana;" that the taking of the property of said
company by Kleinschmidt was without right or authority, and
by so taking he did not acquire any interest therein, as against
other creditors of said corporation; that the several writs of
attachment mentioned in the finding of facts were legal and
valid, and the judgments mentioned as obtained by the plaint-
iffs against said company were legal and valid judgments, and
are now owned by the plaintiffs in this action, and wholly
unsatisfied; that the property taken by defendant Kleinschmidt
was, at the time the writs of garnishment were levied, and is
now, the property of Boesman Bros. & Co., and subject to such
levy, and thereby the plaintiffs in this action acquired a valid
lien upon said property; that the plaintiffs are entitled to have
said property subjected to the satisfaction of their respective
judgments.

To all of which findings of facts and conclusions of law,
defendant excepted, which exception was saved and incorporated
in the record.

Judgment was thereupon entered in favor of plaintiffs against
defendant Kleinschmidt for the recovery of $5,529.54, being
the aggregate amount of plaintiffs' several judgments against
Boesman Bros. & Co. and for costs.   Defendant Kleinschmidt
thereupon moved the court for a new trial on the alleged
grounds: (1) Insufficiency of evidence to justify the decision
and findings of the court, and that the decision and findings
are against law.   (2) Error of law occurring at the trial, and
excepted to by defendant.   The motion was brought on for hear-
ing on a statement of the case, containing, among other matter,
all the evidence, and the specifications of alleged errors of law,

and particulars of insufficiency of evidence; which motion was overruled by the court, and this appeal was thereupon taken from the order overruling the same, and from the judgment.

*Cullen, Sanders & Shelton,* for Appellant.

I.   The plaintiffs in their complaint seek to avoid the assignment upon two grounds: *First.* That it was never executed according to law. *Second.* That it was fraudulent and void as to creditors. The defendant founded his defense upon a written assignment, a copy of which was annexed to his answer. No affidavit whatever was ever filed or served upon the defendant, as required by section 98 of the Code of Civil Procedure. The genuineness and due execution of this instrument were, therefore, admitted by the plaintiffs. (*Sloan* v. *Diggins,* 49 Cal. 40.)

II.   The court sustained defendant's objection to any testimony attacking the genuineness and due execution of this assignment, but permitted the plaintiffs to amend, and proceed with the trial upon the complaint as amended. This amendment was improperly allowed. (*a*) The genuineness and due execution of the assignment had been admitted by the plaintiffs, under the statute above quoted, and they could not, by amendment to their complaint, avoid the effect of their admission. (*b*) The amendment, if it put the plaintiffs in a position in which they could attack the genuineness and due execution of the assignment, made the complaint inconsistent and repugnant in its allegations. A pleader cannot assume inconsistent positions in his pleading; the grounds of action must be consistent. (Bliss on Code Pleading, § 122; *Gardner* v. *Ogden,* 22 N. Y. 327; 78 Am. Dec. 192; *Smith* v. *Hallock,* 8 How. Pr. 73; *Crow* v. *Hildreth,* 39 Cal. 618; *Bowen* v. *Mandeville,* 95 N. Y. 237; *Perkins* v. *Brock,* 80 Cal. 320; *Brown* v. *Nichols,* 123 Ind. 492; *Globe I. R. etc. Co.* v. *Thatcher,* 87 Ala. 458; *Henderson* v. *Boyd,* 85 Tenn. 19; *Losch* v. *Pickett,* 36 Kan. 216; *Indianapolis First Nat. Bank* v. *Root,* 107 Ind. 224.) (*c*) The effect of the amendment was to change the cause of action from one in equity to one in law, and was improperly allowed. (*Halze* v. *Trademan's Nat. Bank,* 4 N. Y. St. 504.) The limit to the power of amending the pleadings on a trial is, that the amendment shall not bring in a new cause of action. (*Reeder* v. *Sayre,*

70 N. Y. 180; 26 Am. Rep. 567; *Fogg* v. *Edwards*, 20 Hun, 90; *Union Bank* v. *Mott*, 10 Abb. Pr. 372; *Van Ness* v. *Bush*, 14 Abb. Pr. 33.) Leave to amend a complaint on the trial so as to change the cause of action from one for equitable relief to one for legal relief, is not allowable. (*Boches* v. *Lansing*, 13 Hun, 38; 74 N. Y. 437; *Matthews* v. *Delaware etc. Canal Co.* 20 Hun, 427; Pomeroy on Remedies, § 566; *Board of Supervisors* v. *Decker*, 34 Wis. 378; *Rutledge* v. *Vanmeter*, 8 Bush, 354–356; *McGrath* v. *Balser*, 6 Mon. B. 141.) A substitution by amendment of one cause of action for another, is inadmissible. (*Phillips* v. *Boughton*, 30 Mo. App. 148; *Barnes* v. *Prewitt*, 28 Mo. App. 163; *Drake* v. *St. Louis etc. Ry. Co.* 35 Mo. App. 553; *Singer Manuf. Co.* v. *Givens*, 35 Mo. App. 602.) A party cannot, by amendment of his pleading at the trial, change the whole nature of his cause of action or grounds of defense. (Boone on Code Pleading, § 237; *Ramirez* v. *Murray*, 5 Cal. 222; *Hackett* v. *Bank of California*, 57 Cal. 336; *Wheeler* v. *West*, 78 Cal. 96; *White* v. *Moss*, 67 Ga. 89; *Tatham* v. *Ramey*, 82 Pa. St. 130; *Silver* v. *Jordan*, 139 Mass. 280; *Carpenter* v. *Huffsteller*, 87 N. C. 273; *Shenandoah Valley R. R. Co.* v. *Griffith*, 76 Va. 913; *Codington* v. *Mott*, 14 N. J. Eq. 430; 82 Am. Dec. 258; *Mahan* v. *Smitherman*, 71 Ala. 563; *Peck* v. *Sill*, 3 Conn. 157; *Brodek* v. *Hirschfield*, 57 Vt. 12.) The same rule prevails in equity as at law. (*Darling* v. *Roarty*, 5 Gray, 71; *Curtis* v. *Leavitt*, 11 Paige, 386.)

III. A board of directors of a corporation has power to make an assignment for the benefit of creditors, without consulting with, or obtaining the consent of the stockholders. (Cook on Stocks and Stockholders, § 691; *Dana* v. *Bank of United States*, 5 Watts & S. 223.) Where all the stockholders, being directors, agree informally, and without meeting, that a certain person shall be the corporate agent, and take entire control, he is authorized to bind the corporation by his acts. (*Wood* v. *Wiley Construction Co.* 56 Conn. 87; *Perkins* v. *Washington Ins. Co.* 4 Cowen, 645; *Hoag* v. *Lamont*, 60 N. Y. 96; *Fleckner* v. *Bank of United States*, 8 Wheat. 338; *Elysville Manuf. Co.* v. *Okisko Co.* 1 Md. Ch. 392.) It appears in this case that Charles Boesman was the acknowledged agent of the company, and general manager, and had absolute control

of its business, and his acts were binding upon the company. (*Chase* v. *Tuttle,* 55 Conn. 455; 3 Am. St. Rep. 64; *Eppright* v. *Nickerson,* 78 Mo. 482.) It is claimed that the seal of the corporation was not affixed, but it appears that the two active directors, the parties interested directly in the corporation, and the only managers thereof, adopted the seal, had it prepared, and it was affixed to the assignment by the secretary *pro tem,* chosen at that time. The court will assume that the seal is the corporate seal, and was affixed by the proper authority. (Cook on Stocks and Stockholders, § 722; *Fidelity Ins. etc. Co.* v. *Shenandoah Valley R. R. Co.* 32 W. Va. 244; *Parker* v. *Washoe Manuf. Co.* 49 N. J. L. 465; *Union Gold Min. Co.* v. *Bank,* 2 Colo. 226; Angell and Ames on Corporations, 224; *Blackshire* v. *Iowa Homestead Co.* 39 Iowa, 624; *Southern California C. Assoc.* v. *Bustamente,* 52 Cal. 192; *Morris* v. *Keil,* 20 Minn. 531; *Trustees* v. *McKechnie,* 90 N. Y. 629; *Chicago etc. R. R. Co.* v. *Lewis,* 53 Iowa, 101; *Morse* v. *Beale,* 68 Iowa, 463; *Goodnow* v. *Oakley,* 68 Iowa, 25; *Evans* v. *Lee,* 11 Nev. 194; *Lovett* v. *Steam S. M. Assoc.* 6 Paige, 54; *New England Iron Co.* v. *Gilbert etc. R. R. Co.* 91 N. Y. 159.) But if the officers were not authorized by an express vote to execute this assignment, the instrument was executed with the consent of all the directors, and of all the stockholders; and a contract of assignment executed under these circumstances is perfectly good and binding upon the corporation. (*Whitney* v. *Union Trust Co.* 65 N. Y. 576; *Bank of Middlebury* v. *Rutland etc. R. R. Co.* 30 Vt. 159; *Wild* v. *New York etc. M. Co.* 59 N. Y. 644; *Susquehanna etc. Co.* v. *General Ins. Co.* 3 Md. 305; 56 Am. Dec. 740; *Tenney* v. *East Warren Lumber Co.* 43 N. H. 343; *New York Cent. R. R. Co.* v. *Barstow,* 15 Md. 494; *Perry* v. *Simpson Water-Proof Manuf. Co.* 37 Conn. 520.) In this case the creditors are assuming that this act was void because it was done without the consent of the stockholders, and in excess of the powers vested in the officers; but if the stockholders could not question the assignment, certainly the creditors cannot do so. The stockholders have ratified this act by their acquiescence and by their direct assent. The fact that there is no record of the election of Richard Boesman as secretary does not militate against the fact that he was secretary *de facto,* and the acts

and contracts by him as an officer *de facto*, acting within the sphere of his office, was binding upon the corporation. (Cook on Stocks and Stockholders, § 713; *Susquehanna etc. Co.* v. *General Ins. Co.* 3 Md. 305; 56 Am. Dec. 740; *Hackensack Water Co.* v. *De Kay*, 36 N. J. Eq. 548; *Morrill* v. *C. T. etc. Co.* 32 Hun, 543.) It is not necessary that the act of the directors should be formally entered in the corporate minutes. The act may be proved by parol, and also that the directors authorized a particular act. (*Nashua etc. R. R. Co.* v. *Boston etc. R. R. Co.* 27 Fed. Rep. 821; *Moss* v. *Averell*, 10 N. Y. 449; *Preston* v. *Missouri etc. Co.* 51 Mo. 43.) Acquiescence of the board of directors will cure the omission of a previous resolution, even when required by the charter. A quorum of the board of directors may make an assignment. (*Buell* v. *Buckingham*, 16 Iowa, 284.) The company may ratify an instrument given by its president. (*Krider* v. *Trustees etc.* 31 Iowa, 547; *Sherman* v. *Fitch*, 98 Mass. 59.)

IV. It is claimed that this assignment is void for the reason that it does not contain the affidavit required by section 1555 of the Compiled Statutes of Montana, which provides: "That all mortgages or deeds of trust, of both real and personal property . . . . executed by an incorporated company . . . . shall be accompanied by the affidavit specified in section 1 of the act entitled "An Act Concerning Chattel Mortgages." But the law has no application whatever to assignments, such as the one under consideration, for the reason that the deeds of trust mentioned in the act referred to deeds of trust in the nature of mortgages. There is a well-settled distinction between a deed of trust and a deed of trust in the nature of a mortgage; the one being for the trust purposes unconditional and indefeasible, while the other is conditional and defeasible in the same way that a mortgage is. (1 Jones on Mortgages, § 62; Burrill on Assignments, § 8; *Hoffman* v. *MacKall*, 5 Ohio St. 124; 64 Am. Dec. 637; *Woodruff* v. *Robb*, 19 Ohio, 212; 1 Hilliard on Mortgages, p. 359; *DeWolf* v. *Sprague Manuf. Co.* 49 Conn. 282.) These authorities conclusively establish that there is no similarity between the deeds of trust mentioned in the statute and this assignment. But if we assume that this instrument is within the provisions of the statute, it being accompanied by a

change of possession of the property, and the assignee having gone into the actual possession of the property, the affidavit became unnecessary.

V. In the next place it is claimed that the agreement marked Exhibit C was fraudulent in its character, and authorized the plaintiffs to maintain a suit to set aside an assignment executed in pursuance thereof. The agreement does not appear to have been made by Boesman Bros. & Co.; it does not appear to have been made with the corporation, and appears to have been a perfectly legitimate transaction by which a party who is about to loan another money seeks to secure himself against loss. (*Anderson* v. *Lachs*, 59 Miss. 111.) The case of *Smith* v. *Craft*, 11 Biss. 340, upon which respondents rely to support this doctrine, is questioned in Waite's Fraudulent Conveyances, section 394, and the case is reversed in 17 Fed. Rep. 705 upon rehearing. The case was subsequently taken to the Supreme Court of the United States and is reported in 123 U. S. 436, where the appeal was dismissed, but the Supreme Court expressly referred to the case of *Bank of Leavenworth* v. *Hunt*, 11 Wall. 391, and *National Park Bank* v. *Whitmore*, 104 N. Y. 297. (See, also, 2 Bigelow on Fraud, § 315; *Spaulding* v. *Strang*, 38 N. Y. 9; *Fechheimer* v. *Baum*, 43 Fed. Rep. 726.) These authorities establish that this agreement, which is the principal basis upon which plaintiffs rest their charge of fraud, was not fraudulent in law, and this being so, there is nothing in the case to warrant the findings of the court. The further finding of the court that Kleinschmidt stood in the same relation to the corporation as its trustees and managing officers, is likewise unsupported by allegation or evidence. If he was a trustee and the plaintiffs desired to enforce his statutory liability as trustee, an action is provided for that purpose, and allegations are necessary to state a cause of action. Directors of a corporation may make an assignment for the benefit of creditors of the corporation, and may even prefer themselves. (*Planters' Bank* v. *Whittle*, 6 Am. & Eng. Corp. Cas. 298.) But there is no pretense in this case that the plaintiffs in their complaint seek to hold Kleinschmidt as a director of the corporation, or as a partner, and there is no proof sustaining any such position, and the court in arriving at conclusions of

this character did so without allegations or evidence to sustain them.

VI.    If this is an action at law, and the proceeding is under the statute for a judgment against the defendant for money due him as garnishee, the right to recover being founded upon the fact that there is no assignment whatever, and not upon the fraudulent character of the assignment, the question of fraud does not enter into the consideration, and is necessarily eliminated.    A debtor in insolvent circumstances has the right to make payment of the claims of particular of his creditors, to the exclusion of others, or to secure the claims, or part of them, without providing that other creditors shall participate in the benefits of the security, or his property may be given in payment or security to one of his creditors, and the transaction will not be considered fraudulent or void.    (*Davis* v. *Gibbon*, 24 Iowa, 263; *Fromme* v. *Jones*, 13 Iowa, 480; *Farwell* v. *Howard*, 26 Iowa, 384; *Cowles* v. *Ricketts*, 1 Iowa, 582.)    There can be no question but that the corporation could make a transfer for the purpose of paying its indebtedness to a single creditor, and when this, accompanied by the actual change of possession, and the entry of the creditor into the actual occupation of the property, it is perfectly valid under the authorities.    (*Stevens* v. *Bell*, 6 Mass. 342; *New England Marine Ins. Co.* v. *Chandler*, 16 Mass. 275; *Sargent* v. *Webster*, 13 Met. 497; 96 Am. Dec. 743; *Buell* v. *Buckingham*, 16 Iowa, 284; 85 Am. Dec. 516.)    In the absence of a bankrupt or insolvent law, a debtor may lawfully give a preference to one of his creditors if he does not thereby intend to defraud the others, and a sale and delivery of goods in satisfaction of an honest debt cannot be avoided by other creditors unless made with intent, in fact, to defraud them. (*Jewell* v. *Knight*, 123 U. S. 434; *Buckingham* v. *McLean*, 13 How. 167; *Warner* v. *Norton*, 20 How. 448; *Robinson* v. *Elliott*, 22 Wall. 520; *Medsker* v. *Bonebrake*, 108 U. S. 66; *Stewart* v. *Dunham*, 115 U. S. 61; *Jones* v. *Simpson*, 116 U. S. 609; *Peoples' Savings Bank* v. *Bates*, 120 U. S. 556; *Huiskamp* v. *Moline Wagon Co.* 121 U. S. 317.

*Walsh & Newman, McConnell, Clayberg & Gunn, Davies & Russell, Shober & Rasch*, and *Penry & Purcell*, for Respondents.

I. Appellant first contends that the plaintiffs admitted the genuineness and due execution of the instrument in question by failing to serve and file an affidavit as required by section 98, page 84 of the Compiled Statutes. The statute in question has no application in this case. The scope and object of the statute is shown by the decision in the case of *Sloan* v. *Diggins,* 49 Cal. 40, cited by appellant. The reason of the statute is to present an issue upon genuineness and due execution of an instrument which is relied upon as a defense, if the plaintiff desires to attack the instrument, and of course where these issues are tendered by the complaint and answer there is no reason for requiring the affidavit. The statute in question is taken from California, where the pleading known as a replication is not in use. In this State, however, the replication belongs to our system of pleading, and where a replication has been made we submit the statute has been complied with. In this case the plaintiffs filed their replication denying the genuineness and due execution of the instrument. Again, this case does not come within the statute, for the reason that the defendant does not base his defense upon the instrument. His defense is that the instrument was executed by the corporation and is not fraudulent. These are facts extrinsic of the instrument.

II. Appellant next contends that the court erred in permitting the plaintiffs to amend their complaint. (1) Because the genuineness and due execution of the instrument had been admitted by the plaintiffs. (2) Because the amendment presented inconsistent positions in the complaint. (3) Because the amendment changed the cause of action from one in equity to one in law. The first of these objections has already been answered; the other two will be considered together. A court of equity will exercise its jurisdiction to remove an obstruction whenever the obstruction would prevent a judgment creditor from realizing the full value of the property, whether the instrument creating the obstruction is fraudulent or invalid for other reasons. (*Seybert* v. *Pittsburg,* 1 Wall. 272; *Tuck* v. *Olds,* 29 Fed. Rep. 738; Freeman on Executions, § 424; *Beck* v. *Burdett,* 1 Paige, 305; 19 Am. Dec. 436; *Myers* v. *Hewitt,* 16 Ohio, 449; *McElwain* v. *Willis,* 9 Wend. 559; *Crippen* v. *Hudson,* 13 N. Y. 164.) In this case, therefore, the action would still be a suit in

equity, if there was no question of fraud presented. There is but one cause of action stated, either in the original complaint or the amended complaint, and it is a cause of action in equity. There are, however, several grounds upon which this single cause of action is based, and they are not inconsistent. (*Pittsfield Nat. Bank* v. *Tailer*, 14 N. Y. Sup. 557; *Leopold* v. *Silverman*, 7 Mont. 266.) The amendment made only stated more specifically the grounds upon which the cause of action is founded. Such amendments are always allowable. Amendments may be made in furtherance of justice at any time, and may be made during the trial, or at the close of the evidence or after judgment. (*Williston* v. *Camp*, 9 Mont. 88; *Southmayd* v. *Southmayd*, 4 Mont. 107; *Ramsey* v. *Cortland Cattle Co.* 6 Mont. 498; *Hartley* v. *Preston*, 2 Mont. 415; Code Civ. Proc. § 116.) Inconsistencies in pleadings can only be taken advantage by demurrer on motion, and are waived if no demurrer or motion is filed. (See Code Civ. Proc. § 88; *Mecham* v. *McKay*, 37 Cal. 154; *Buhne* v. *Corbett*, 43 Cal. 264.)

III. Under our statutes a corporation is prohibited from making such an assignment. (Comp. Stats. § 482, p. 736.) Independently of statute, the right of a corporation to make an assignment with preferences was always denied until the case of *Catlin* v. *Eagle Bank*, 6 Conn. 233, was decided. The doctrine laid down in this case is severely criticised by Morawetz in his work on Private Corporations, section 803. (See, also, Taylor on Private Corporations, § 615; *Sanger* v. *Upton*, 91 U. S. 56; *Wood* v. *Dummer*, 3 Mason, 308; *Morgan* v. *Allen*, 103 U. S. 498; *Curran* v. *State*, 15 How. 304; *Haywood* v. *Lincoln Lumber Co.* 64 Wis. 639; *Bartlett* v. *Drew*, 57 N. Y. 587.) Sections 488 and 489, fifth division of the Compiled Statutes, provides a method for application of assets of corporations to payment of its debts.

IV. The use of a corporate seal is not dispensed with in this State. (See Comp. Stats. § 1963, p. 1206.) The corporation never having adopted the seal used, the instrument is not the instrument of the corporation. (*Danville Seminary* v. *Mott*, 136 Ill. 289; *Richardson* v. *Scott R. W. & M. Co.* 22 Cal. 150.) Appellant argues in his brief that from the fact that what purports to be the seal of a corporation is affixed to the

instrument, the presumption arises that the seal used was the seal of the corporation. Admitting this to be true the evidence is conclusive that the seal was never adopted by the corporation and was not the corporate seal.

V.   The statutes of this State provide that "the stock, property, and concerns of a company shall be managed by not less than three nor more than nine trustees. Mr. Morawetz, in his work on Private Corporations, section 53, says: "The general rule is that the directors of a corporation have no implied authority to act singly: they can only act as a board unless there be a different custom, or an express delegation of authority to act individually. Either, all must be present at a meeting or the meeting must be called in a regular manner and all the directors given notice. In the latter case, if the majority assemble they act by a major vote." To this proposition see further: Cook on Stocks and Stockholders, § 592, and note; *Alta Silver Min. Co.* v. *Alta Placer Min. Co.* 78 Cal. 629; *Read* v. *Buffum,* 79 Cal. 77; 12 Am. St. Rep. 131; *Gashwiler* v. *Willis,* 33 Cal. 12; 91 Am. Dec. 607; *Southern California etc. Assoc.* v. *Bustamente,* 52 Cal. 192; *In re St. Helen Mill Co.* 3 Sawy. 88; Taylor on Private Corporations, § 258; Field on Corporations, § 152; Cook on Corporations as Effected by Statutes, §§ 712–792; *Harding* v. *Vandewater,* 40 Cal. 77; *Farwell* v. *Houghton Copper Works,* 8 Fed. Rep. 66; *Baldwin* v. *Canfield,* 26 Minn. 43; *Simon* v. *Sevier Co. etc. Assoc.* 54 Ark. 58.)

VI.   Richard Boesman had no authority to execute the instrument as secretary, nor to affix the seal to the instrument if the seal affixed had been the seal of the corporation. "The seal of a corporation must necessarily be affixed by an agent acting on behalf of the company, and if used by an agent without authority the sealing will not bind the company." (Morawetz on Private Corporations, § 339; *Bliss* v. *Kaweah C. & I. Co.* 65 Cal. 502; *Jackson* v. *Campbell,* 5 Wend. 572; *Hoyt* v. *Thompson,* 5 N. Y. 320; *Danville Seminary* v. *Mott,* 136 Ill. 289.) If there were only two trustees at the time this assignment was made, then they had no power to do a single corporate act, and the assignment would certainly be invalid. (Mont. Comp. Stats. § 450, p. 726; *Moses* v. *Tompkins,* 84 Ala. 613; *Kirk* v. *Bell,* 16 Q. B. 290; 58 L. T. 525; Cook on Stocks and Stock-

holders, § 592, and note; *Doyle* v. *Mizner*, 42 Mich. 332.)
It is also contended by appellant that if this pretended assignment was void because not executed by the corporation it was subsequently ratified. If, as appellant contends, there were only two trustees in the corporation, then they could not ratify the pretended assignment for the same reason that they could not execute it. (*Bi-Spool S. M. Co.* v. *Acme Manuf. Co.* 153 Mass. 404.) An act cannot be ratified where the rights of third persons have intervened. This principle is elementary. (Hermann on Estoppel, § 1175; *Wilcoxson* v. *Burton*, 27 Cal. 235; 87 Am. Dec. 66; *Wittenbrock* v. *Bellmer*, 57 Cal. 12.)

VII. Section 1555, fifth division of the Compiled Statutes of Montana, requires the affidavit upon all mortgages or deeds of trust executed by a corporation regardless of the question of the possession of the property embraced therein. An assignment for the benefit of creditors is a trust deed. The assignee is the trustees and the creditors are the beneficiaries. (2 Pomeroy's Equity Jurisprudence, §§ 994, 995.) The courts require a strict compliance with the provisions of the statute relative to chattel mortgages, and the same rule should apply to instruments mentioned in section 1555. (*Butte Hardware Co.* v. *Sullivan*, 7 Mont. 307; *Leopold* v. *Silverman*, 7 Mont. 266; *Baker* v. *Power*, 7 Mont. 326.)

VIII. Appellant contends that the conclusion of law by the court that the secret agreement entered into between Kleinschmidt and the officers of said corporation, and the procuring of the pretended assignment under said secret agreement was a fraud upon the other creditors of said corporation, is unwarranted. We submit that considering Kleinschmidt's connection with the corporation, and all the circumstances surrounding the making of this agreement, as shown by the statement of facts hereinabove given, the agreement in question, and the pretended assignment procured under it, were clearly a fraud upon the other creditors. (*Blennerhassett* v. *Sherman*, 105 U. S. 100.)

HARWOOD, J. — The first assignment of error by appellant's counsel is based upon the allowance of said amendment of the complaint, as set forth in the above statement. Appellants

insist that having pleaded said instrument, alleging that said company had "duly made, executed, and delivered" the same to defendant, and annexed a copy thereof to the answer, "the genuineness and due execution of such instrument" was admitted by reason of plaintiffs' failure to deny the same by affidavit, as provided in section 98 of the Code of Civil Procedure, which reads as follows: "When the defense to an action is founded on a written instrument, and a copy thereof is contained in the answer, or is annexed thereto, the genuineness and due execution of such instrument are deemed admitted, unless the plaintiff file with the clerk ,within ten days after the filing of the answer, an affidavit denying the same, and serve a copy thereof on the defendant." Upon this point appellants cite *Sloan* v. *Diggins*, 49 Cal. 40. To this citation may be added *Parkison* v. *Boddiker*, 10 Colo. 510; *Crowley* v. *City R. R. Co.* 60 Cal. 628; and *Fox* v. *Stockton etc. Agricultural Works*, 73 Cal. 273, as treating of the application of said provisions of statute. Respondents resist this position by arguing that the provision of the statute cited was taken from California, where the system of pleading included no replication, and, there being a verified replication provided for in the Montana Code, said statute does not, in reason, apply with the same force as was given to it in California.

Although in our system of pleading, as prescribed in the Code, a replication is provided for, and it is also provided that pleadings shall be verified, still the legislature has retained in the Code, sections 97–99, which are distinct, in their provisions, even from the subject treated in the other portion of chapter 6 of the Code. And the same follow immediately after the provisions defining what pleadings shall be used in a civil action, and their contents and purpose, and that the same shall be verified. From the earliest enactment of the Code in Montana, it has contained provisions similar to those sections, yet in terms varying somewhat from time to time, as the Code has been revised and readopted. The Code adopted by the legislature convened at Bannack in 1864 (§§ 52, 53) provided substantially the same- as sections 97 and 98 of the present Code. In the revision of the Code adopted at the seventh session, convened in 1871, it appears that only the substance of section 52 of the

Bannack Code (being substantially the same as section 97 of the present Code) was retained. (See 7 Sess. Laws, § 62, Code Civ. Proc.) At the tenth legislative session, another revision of the Code was adopted, and sections 52 and 53 of the earliest Code were again reinstated, side by side, in a slightly modified form, and another section on the same subject was added. (See 10 Sess. Laws, §§ 95–97, Code Civ. Proc.) In the latter revision these provisions appear in exactly the same terms as in sections 97, 98, and 99 of the present Code of Civil Procedure, and have retained that form from the tenth session to the present time. The modification of those provisions, the omission and reinstatement of certain portions thereof, and the addition of a further provision on the same subject in the various revisions of the Code, show the deliberation with which the legislature has enacted them; and during all the time the system of pleading prescribed in this Code, of which these sections are a part, provides for a verified replication as to new matter set forth in the answer. Section 99, which appears to have been added in the revision of 1887 (10 Sess. Laws, § 97, Code Civ. Proc.), sheds additional light upon the intent of the legislature, if any such light was needed. It seems clear, when said sections are considered together, that the legislative intent was to provide that a party may rely upon not being put to the trouble of proving the genuine character and due execution of an instrument *upon which an action or defense is founded*, where a copy thereof is set out in, or annexed to the pleadings, unless the genuineness or due execution of such instrument is directly denied in the manner required: *provided*, the party pleading the same allows an inspection of the original on demand. This seems to be a just and salutary provision. Otherwise, mere formal, or possibly captious, denials might in many cases be asserted by a party who had neither made investigation, nor had any positive apprehension that the instrument asserted by copy was fictitious or a forgery, or not duly executed. Such denial might, without just reason, involve great trouble, delay, and expense in proving the matter denied, by reason of the lapse of time, death, or change of residence of the parties or witnesses. In the case of negotiable instruments, which have extended circulation, it is perceived at once that the rule pre-

scribed in said sections would be a just and salutary one. It should be observed, however, that the requirements of said sections appear to be applicable (1) only to instruments *on which the action or defense is founded;* (2) *only when a copy is set out in the pleadings, or annexed thereto;* (3) *only where inspection of the original is allowed on demand.* It is apparent that there are a great many cases in which written instruments, or other writings offered in evidence in the course of a trial, would not be controlled at all by said provisions. We are not inclined to hold that the proper force and effect of the provisions of sections 97, 98, and 99 of our Code are inapplicable because a replication is provided for in our system of pleading. No doubt the replication can be used to effect the denial of the "genuineness and due execution" of an instrument set forth in the answer, by following the requirement of section 98 of the Code, because the substance of things, and not mere form, is the essential feature. It seems from said provisions that it was intended such denial should, in unequivocal terms, deny the genuineness or due execution of the instrument pleaded by a copy, after full opportunity to examine the original. This certainly could be done by verified replication, where an instrument on which the defense is founded, is set out by copy in, or annexed to, the answer. The only further requirement of section 98 is the service of such denial. But in the case at bar it does not appear that plaintiffs even contend that the denials in the replication answered the requirement of said statute, if this was a case where the provisions of said statute applied.

We think it is apparent, however, that the provisions of said statute have no application to the instrument pleaded in defendants' answer in this case, and annexed thereto by copy. The object of the action was to contest the right of Kleinschmidt to the property received by him from said company. In the proceedings which preceded this action, Kleinschmidt had held up said assignment as the title by which he claimed the right to receive, hold, and dispose of said property, according to the directions of said instrument. That instrument stood in the way of these creditors in their attempt to reach and apply said property to the satisfaction of their demands. The purpose of the complaint was to show grounds, if any could be shown, why

said assignment should be declared null and void, and have the same set aside, or treated as of no force or effect; and the property of said company, as it stood at the time of making the alleged assignment, still be considered and treated as property belonging to said company, in the possession of Kleinschmidt, subject to plaintiffs' demands through the liens acquired by garnishment in the former proceedings. The allegations of the complaint were directed to that end, and attempted to accomplish that result by showing facts entirely outside of said instrument. In the averments of paragraph 24 of the original complaint, the plaintiffs "laid the axe upon the root of the tree," but did not cut deep enough to destroy it. Hence, when it was attempted to show by the introduction of evidence that said instrument never had in fact been executed by authority of, and as the act of said company, the court held, as we think correctly, that the allegations of the complaint were insufficient to permit the introduction of such testimony. Plaintiffs did not rely upon their replication to effect the purpose desired. They went to their complaint, and, apparently admitting that the original allegations thereof were insufficient, applied to the court, upon affidavit setting forth the facts which they desired and intended to introduce proof to establish, and sought leave to amend their complaint, by alleging facts upon which that proof could be introduced. The amendment was allowed, no doubt, in view of section 116 of the Code of Civil Procedure. It is true, as defendants assert, that said amendment introduced new issues upon which plaintiffs sought to avoid said instrument. That fact would undoubtedly have been ground for a continuance if defendants had asked it, but no continuance was sought. We think, under the provisions of the Code, the court was authorized to allow the amendment, and that the object of the action being to annul or avoid said instrument, for reasons not shown on its face, the complaint was the proper pleading in which to set forth the facts relied on to annul or avoid the same. We do not think the case is one to which section 98 of the Code of Civil Procedure applied, because the instrument set up in the answer was not strictly a defense to the action, nor was the defense strictly founded upon said instrument, in the sense that the instrument in itself was a defense to the action. Where

it is affirmed in an action that a certain instrument relied upon by a party was made with intent to defraud, or that it was not a genuine instrument, and the facts are alleged which, if proved, would tend to establish such affirmation, can the party seeking the benefit of such instrument defend such action by holding up the instrument, and assert that it is the defense? It would seem in such a case, where the attack was made by showing facts outside of the instrument, that the instrument would not be the defense; that the defense would be accomplished by rebutting the attempt to impugn the good faith of the transaction evidenced by the instrument, or by rebutting the attempt to show that it was not genuine, and such showing could not proceed from the instrument itself. The instrument might be said to be the subject of the action, but the action is not founded upon the instrument. The action is founded upon facts *dehors* the instrument, and the instrument itself, we apprehend, could not operate as its own defense, or the foundation of the defense to such an action; but the defense would depend upon facts *dehors* the instrument.

The court held said assignment void, upon the ground, among others, that it was not accompanied by the affidavit mentioned in sections 1538 and 1555, fifth division of the Compiled Statutes. Section 1555 constituted in itself a separate act of the legislative assembly, entitled "An Act Concerning Mortgages of both Real and Personal Property of any Incorporated Company." This act was, without doubt, intended to enable corporations owning property of a mixed character, both real and personal — such as a street railway, with the rolling stock and other appliances, and equipment for supplying motive power, whether by the use of animals or machinery, some of which would be classed as personalty, while other portions of the plant could be classed as real property; or such property as is owned by gas or water companies, or mining companies, where the plant, being one property, includes both realty and personalty — to mortgage the same in one instrument, which would be governed by the law relating to mortgages of real estate. And as to the personal property included therein, such instrument would not be subject to the limited duration of a strictly chattel mortgage. In cases of that kind, where a large proportion of the value of the entire

plant is in personal property, and so connected with the entire plant as not to be severable therefrom, without injury or destruction of the property, it was expedient to provide a way by which a corporation owning a property of such mixed nature could hypothecate the same, to secure bonded or other indebtedness, by one instrument not subject to the limitations of a strictly chattel mortgage. Such was the purpose of said act. It relates to mortgages, or deeds of trust partaking essentially of the nature of a mortgage, for security, where no actual change of possession of the property accompanies the transaction. We are confident that the act was not intended to apply to assignments or transfers of personal property, or of both real and personal property, by a corporation, where actual delivery of possession accompanies the conveyance, even though such conveyance and delivery of possession was in trust to convert the property into money and pay debts, and would not, therefore, apply to the instrument in question in this case.

The court further held that by means of Kleinschmidt's "connection with said company, and his action in organizing said corporation, and controlling its affairs, he gave to such corporation a credit wholly fictitious, and in violation of the laws of Montana relating to corporations, and the management of the same; and by reason of his acts aforesaid Kleinschmidt stood in the same relation to said corporation as its trustee and managing officer," and by reason of such connection with, and control of the affairs of said company by Kleinschmidt, and by reason of the agreement between himself and said company, for security of the claims held by him, in case said company became financially embarrassed, the said assignment procured by Kleinschmidt was fraudulent and void as to the creditors of said company; and that the taking of possession of said property by Kleinschmidt was without right or authority; nor did he thereby acquire any interest in said property against creditors of said company.

These conclusions of law, and all findings of fact upon which the same are based, were excepted to by defendant Kleinschmidt, and are assigned in this appeal as erroneous, on the ground that the evidence in the case does not justify said conclusions, or the findings of fact upon which the same are presumably based.

This assignment of error, and other assignments allied to it, require a careful review of the whole case, as set forth in the record, including the evidence:

It should be remembered in this inquiry that the complaint attacked this assignment on two grounds: *First.* Because it was not made by authority of the corporation. *Second.* Because it was made with the intent and purpose of hindering, delaying, and defrauding the creditors of the assignor. Under the first head it was sought to show that the assignment was not authorized by vote or resolution of the stockholders or trustees of said company at a meeting duly and regularly called; that Richard Boesman, who signed said instrument as secretary, was not the secretary of said company, he never having been regularly elected as such, and that the seal affixed to said instrument, purporting to be the corporate seal of said company, was not its seal, because it had never been regularly adopted by said company as its corporate seal. Neither the findings of fact nor conclusions of law expressly refer to any irregularity respecting the corporate seal as grounds for declaring said instrument a nullity; but evidence was introduced as to the regularity of the adoption of the corporate seal, and that question is argued in briefs of counsel. We therefore group that alleged cause of nullity with the others presented by the plaintiffs.

The evidence introduced shows, as set forth in findings 1 to 3, inclusive, that said company was organized and commenced operations in October, 1888; that the three Boesman brothers — Charles, Henry, and Richard — were the organizers, members, stockholders, trustees, and officers of the so-called corporation; that, after the organization of such company, and the naming of the said Boesman brothers in the certificate of incorporation as the trustees thereof for the first three months of its existence, and the holding of one meeting of the trustees at which said persons were elected to the office of president, secretary, and treasurer, respectively, of said company, no other meeting of the stockholders or trustees was ever held. The corporation was organized on a stated capital of $10,000. In finding No. 5 it is affirmed by the court that at the time of the issuance of stock in said company to said Boesman brothers, respectively, each and all of them were insolvent, and that

Kleinschmidt and the Union Warehouse Company, of which he was president, supplied the goods on which said Boseman Bros. & Co. commenced business. The evidence shows further that Kleinschmidt loaned said company money with which to commence and carry on its business, besides the goods supplied on credit; and for such goods and money took promissory notes from said company, or the individual members thereof. But we are unable to discover in the record evidence to support the finding that said Boesman brothers were insolvent. Undoubtedly all that was meant by the court in that finding is that it appears from the evidence that neither of said brothers was the owner of any property upon which to commence business, or with which to buy an interest therein. That condition, however, does not in law place a man in the category of insolvents. (Anderson's Law Dict. 552, 553; 1 Bouvier's Law Dict. 809; Webster's Unabr. Dict.; 11 Am. & Eng. Law, 168.) There is no showing in the evidence that any of the Boesman brothers were indebted and unable to pay their debts at the time said company was organized to commence business. For aught that appears in the evidence, each of them may have been entirely clear of indebtedness, and with good business prospects. This finding is noticed, because in a case where fraud is alleged, and it is contended that the party, against whom fraud is charged, organized a company to accomplish fraudulent purposes, all such conditions have a bearing to some extent. If Kleinschmidt, by giving credit as stated in the findings, aided insolvent persons, instead of persons clear of debt, and with fair business prospects, to embark in business, that fact might tend to attach suspicion to the promoter of the enterprise, considered in connection with other charges.

The eighth finding affirms that "said corporation was organized at the suggestion and instigation of said Kleinschmidt; that at the time said corporation was transacting business he had full knowledge and control of its affairs, and exercised such control, and that said corporation was enabled to secure and did secure, solely on account of the solvency and indorsement of said Kleinschmidt, credits upon which it could do, and did do, business." This finding of fact, together with the conclusion that Kleinschmidt stood in the same relation to said corporation as the

trustee and managing officer, is the main support of the decision against Kleinschmidt holding him liable to pay plaintiffs' judgments against said company; and he complains that the evidence does not justify this finding.

As to the circumstances under which said company was formed, there is no material dispute between witnesses. Henry Boesman, a witness called on behalf of the plaintiffs, was asked concerning said organization and commencement of business by said company, and in his testimony said: "I cannot tell who first suggested the organization of the corporation of Boesman Bros. & Co. I was not there at the time. There was some talk about starting a business before I came back to Helena. Kleinschmidt was our financial backer. We got money from him to start the business. When we started business we got about $4,000, for which we gave Kleinschmidt a note. We did not receive any money from Kleinschmidt. We got about $6,000 worth of goods at the start, and we paid him $4,000. Boesman Bros. & Co. did not have any property when they started business. The amount of the company's indebtedness when we started business was what we owed Kleinschmidt at the time we commenced. We owed Kleinschmidt for goods that we got of him. I believe it was $5,500. I don't remember exactly how much. Kleinschmidt was familiar with our business in a general way, but he did not know anything about the details." Again, the witness says upon the same point: "I am one of the three brothers, Charles, Henry, and Richard Boesman. At the time we determined upon organizing this corporation I was working at Townsend. My two brothers, Charles and Richard, were in Helena at the time. Charles Boesman was traveling for the Union Warehouse Company, and Richard Boesman was clerking in Fred Lehman's store. Just before the company was organized, Charles Boesman and Paffendorf were in partnership. Their business was never started. It was talked of. Charles, Henry, and Richard Boesman were the original trustees of Boesman Bros. & Co. . . . . When we went into business we had the stock of goods we bought from Kleinschmidt; it consisted of wines and liquors. The value of that stock was about $5,500. The corporation of Boesman Bros. & Co. bought

that of Kleinschmidt." Charles Boesman, a witness called
on behalf of plaintiffs, was asked to state the circumstances
under which said corporation was formed, and said: "I am
not certain whether this company was organized at my sug-
gestion, or at the suggestion of Kleinschmidt. I think Klein-
schmidt talked first about it. I recollect it was in August
he talked to me in the street car about it; just suggested
it, and said, if we wanted to start in business, to take part
of his stock, just as we needed it. He was present at the time
the company was organized. He did nothing with regard to
the organization; just made suggestions once in a while. We
got capital stock this way: We gave him our individual notes,
and it was first intended that he should deposit a check for
$4,000 in the bank; and after that he gave up the idea, and
indorsed our notes, as we needed it, to the amount of $4,000."
This witness further said: "Kleinschmidt did not have any-
thing to do with the management of our business. For the last
two months he did. He came and looked over our books, and
so on. He did not give any directions prior to that time; just
made suggestions was all. During the two months he knew
what the amount of our indebtedness was. He knew what
creditors we were owing for goods, in the East. He knew our
financial condition." Kleinschmidt testified as to the organiza-
tion of said company, and the part he took in respect thereto, to
the following effect: "I know Charles Boesman quite well. He
was in my employ about seven or eight months, perhaps longer.
Henry Boesman I knew casually. I am not sure I ever knew
Richard Boesman before he became a member of said company.
I think the corporation of Boesman Bros. & Co. was organized
some time in October, 1888. A proposition came to me from
Charles Boesman, after I had sold out the business of the Union
Warehouse Company. I had assisted one of the young men,
who is now a member and a stockholder of the Union Mercan-
tile Company, to become a stockholder. I loaned him $10,000,
so that he could join that corporation, and buy $10,000 of
its stock. Charles Boesman interviewed me, and says: 'You
have helped Cottingham, and I have been with you, and, if
you could assist me, I think I could arrange with Paffendorf
to go into the liquor business here;' and we talked about it,

and he afterwards brought Paffendorf to me. I arranged then to sell him and Paffendorf my broken stock of liquors. They bought, measured, inventoried, and accepted them, and I believe they ordered goods from some other place to go into business. I agreed to build a house over on Clore Street that they would rent for $75 a month. I commenced the building of the house, excavation, and made contracts for the construction of the house. The goods remained in the Union warehouse that they bought of me. A car of beer consigned to Boesman Bros. & Co. arrived here. Brisben called on Paffendorf, and furnished his quota of the capital. He made arrangements with him to loan him his part of the capital, which was $2,500; each one was to furnish that. Paffendorf did not come forward, and Boesman came to me, and said he had backed out of the arrangement, and says: 'What can I do? If you help me out of this, and fix it so that my brothers could come in, I think we can make money; and, if you can advance some money so we can start, we will go ahead with the business;' and we talked it over, and I agreed to do it. They incorporated, and made arrangements with me to borrow $4,000." It will be remembered that Kleinschmidt is corroborated in his version of the conditions and circumstances pertaining to the organization of said company and the commencement of its business by the testimony of the plaintiffs' witness, Henry Boesman. Charles Boesman was called in rebuttal, and said: "I remember when this company was organized; it was on the 1st of October, 1888. It seems to me that Kleinschmidt suggested to have it the 'Montana or Helena Liquor Company,' or something like that; and we thought we might just as well run it in our individual names; and I think he suggested the name of Boesman Bros. & Co.; and it was immaterial to us, so we just adopted the name."

In this connection the evidence is to be further examined, to ascertain whether or not the finding that Kleinschmidt had and exercised control of the affairs of said company during the time it transacted business is sustained by proof.

Henry Boesman says in his testimony that "Kleinschmidt was familiar with our business in a general way, but he did not know anything about the details;" that when the company was

organized and commenced business Kleinschmidt insisted that each of the Boesman brothers should limit himself to $75 per month in cash out of the proceeds of said concern, for personal use; and further stated: "As I said before, Kleinschmidt knew all about the business in a general way. He examined the books once in a while, perhaps once in two months. I think in a general way he knew what persons we owed for goods, and who were foreign creditors. Sometimes we consulted with Kleinschmidt with regard to buying goods." That at the time the company was formed, "we had a meeting of the incorporators, and elected Charles Boesman president, and myself secretary, and Richard treasurer of the company. At that time it was determined that Charles Boesman was to have the general management and control of the business. We others were present, and gave our services all the time." That afterwards this witness, Henry Boesman, left said institution, and commenced what appears to have been a branch business at Butte, Montana, and in this connection he says: "I went to Butte. It was understood I should have exclusive control and charge of the Butte business, as far as the Helena business was concerned, and that Charles and Richard should have control of the Helena business." That said "arrangement remained in force until May, 1890. We dissolved partnership; that is, the Helena business dissolved partnership with the Butte business. After that time I entirely retired from the Helena business, and had nothing whatever to do with it." Charles Boesman said, concerning the management and control of the business of Boesman Bros. & Co. during the existence of said company: "I managed the business. I ran the business from the 1st of October, 1888, to the 11th of June, 1890," when the assignment was made. He further testified: "At the time of making the assignment Kleinschmidt wanted to restrict us to certain rules, and to do either that or make an assignment. The rules were: He wanted us to sell for cash only, because he wanted us to do a smaller and safer business. Kleinschmidt did not have anything to do with the management of our business. For the last two months he did. He came and looked over our books, and so on. He did not give any directions prior to that time; just made suggestions

was all.  He examined our books.  During the two months he knew what the amount of our indebtedness was.  He knew what creditors we were owing goods for in the East.  He knew our financial condition."  He further testified that Klein-schmidt insisted on the members of said company limiting themselves to $50 per month for personal use, out of the proceeds of said concern, but he added in that connection, "We overdrew most of the time."  He further testified, saying: "Charles and Richard were the trustees of the corporation of Boesman Bros. & Co. on the 12th of June.  Henry had retired from the corporation and gone to Butte to live.  He had nothing whatever to do with the management of the affairs.  Richard Boesman and myself were the sole managing trustees of the corporation at the time.  Charles and Richard Boesman were the stockholders of Boesman Bros. & Co. at the time.  On the 12th of June, 1890, Henry Boesman had retired.  He sold his interest.  I know of his selling of his stock to a man by the name of Sillis.  He had assigned his stock to Sillis at the time the assignment was made, and had nothing whatever to do with the corporation in any way.  Sillis at the time lived in St. Paul, and was not at the time acting as trustee or anything of the kind.  He had not been elected as a trustee.  I do not know where his stock is.  The certificates of the stock when I last saw them were in our safe.  I do not know what became of them.  I think they were turned over by my brother before he left.  The stock which Sillis took was turned over to my brother before he left.  I think Sillis had half of the stock assigned to him in that agreement.  I agreed to obtain for Sillis thirty-three shares of the stock.  This was in addition to the stock which Henry Boesman turned over to him.  Henry Boesman's share is a part of the thirty-three shares.  I never obtained the balance for him.  At the time of the assignment, Henry Boesman had no interest whatever in the corporation, either as a stockholder or otherwise."  Further explaining said transaction with Sillis, the same witness said: "I never transferred the stock to him [Sillis] as president.  He went to St. Paul after we made that agreement, and when he came back he said he could not raise the money."  The same witness further testified:

"For two months before this assignment was made there was an effort to restrict the purchase of goods. Kleinschmidt was anxious for us not to purchase any more goods. Kleinschmidt suggested to restrict us in everything. He wanted us to sell for cash only; wanted us to reduce our purchases down to small amounts. He suggested that we buy everything for cash and sell for cash." This witness, Charles Boesman, whose testimony we have just been quoting from, was, by all witnesses for both plaintiffs and defendants, said to have had general charge and management of said business, and the leading member and owner in the company, and such is his testimony as to Kleinschmidt's part and lot in relation thereto. The deposition of Richard Boesman was introduced by plaintiffs. He testified that while the Boesman brothers were engaged in the operation of said business, Kleinschmidt was their "confidential adviser in all business transactions of importance. The reason he advised us in regard to the business, we borrowed his money, and he gave us goods to run the business." Again he says: "My oldest brother managed the affairs of the corporation."

Defendant Kleinschmidt in testifying said: "So far as I know, Charles Boesman was president of the corporation of Boesman Bros. & Co. He had the entire management of the concern, after Henry Boesman went to Butte. Henry Boesman went to Butte some time in the early part of January or the latter part of December, 1889, or 1890." He further testified that "at the time I returned from California, in March, 1890, I urged upon the Boesmans to discontinue the purchase of goods, and turn the business into a cash business, so as to be able to liquidate, and not to require any further assistance. Charles Boesman thought it was a good suggestion, but I do not think they ever followed it out. For two months prior to the assignment, the ledger of Boesman Bros. & Co. showed that they purchased about $1,100 worth of goods. Before that their purchases were from $4,000 to $6,000 per month. I had no interest in the corporation of Boesman Bros. & Co. except to get what they owed me. This assignment, which was made on the 12th of June, 1890, was not made or procured on my part with the intent to hinder,

delay, or defraud the creditors of the corporation of Boesman
Bros. & Co. I had no intent to defraud any one. I have
never been a partner of Boesman Bros. & Co., either as a corpo-
ration or otherwise. I have never been a partner of them. I
do not know why this corporation took the name of Boesman
Bros. & Co. There were three brothers, though, and naturally
I supposed it would take that shape, on the ground that there
were more than two of them, though I do not know positive as
to that."

We are unable, upon a careful study and consideration of all
the testimony, to find proof to support the finding of the court
that Kleinschmidt had and exercised control and management
of the affairs of said company during its business career, in any
sense which justified the conclusion that he "stood in the same
relation to said corporation as its trustee and managing officer."
The finding that he had knowledge of the affairs of the com-
pany is supported by proof that he had general knowledge of
the affairs and condition thereof. He was a creditor of the
company from the commencement of its career, and as such he
had a right to inform himself of its affairs and condition. Such
action was not fraudulent, nor could that operate to defraud any
one, unless, having such knowledge, he was guilty of conduct
calculated to deceive, and which did deceive, others to their
injury. The evidence also shows that Kleinschmidt gave advice
to the Boesman brothers from time to time in respect to the
management of said business; and in every instance where a
witness relates what such advice was, it is shown to have been
of a nature calculated to protect, rather than injure or preju-
dice, others interested in the success of said company. Such
prudent advice was in no way fraudulent. Kleinschmidt
sought by way of advice to influence its managers to curtail the
proportion of its credit business, and pay its indebtedness, and
transact business on a cash basis. But it seems such policy was
not adopted; and finally, when the affairs of said company were
undoubtedly in a bad financial condition, Kleinschmidt insisted
on that rule being adopted, or that an assignment be made.
If Kleinschmidt had and exercised control of the affairs of said
company, and of the Boesman brothers in charge of its oper-
ations, why did he not put in force the wholesome suggestions

which all witnesses say he made? It is clearly shown that he did not profit at all by the manner in which said company conducted its business, and that such conduct not only resulted in loss to the plaintiffs in this case, but in greater loss to Kleinschmidt. There is no dispute as to this result. The testimony shows without dispute that Kleinschmidt's claims against said company were not in any manner fictitious, but for the value of the goods and for money intrusted to said company on credit; and it appears from the reading of the testimony of the Boesman brothers that they were not unwilling witnesses for plaintiffs, and made no effort to favor Kleinschmidt. They were the witnesses called by plaintiffs. This is not a case of conflict of testimony. There is very slight, if any, conflict in the testimony on the material questions in this case. This action was the final and supplemental proceeding in an investigation which had been going on for some time, in proceedings supplemental to garnishment and execution; in which proceedings ample means were afforded for the discovery of all facts and conditions pertaining to the matters in controversy. If said company, its members and managers, were all under the control of Kleinschmidt, and he was intending to so operate it as to defraud its creditors, why is it that all his influence and suggestions, as brought to light by the testimony, without one exception, would tend, if followed, to put said company's affairs in such condition that no one would have suffered loss, unless it be himself, who was its heaviest creditor? The very policy which Kleinschmidt advised and sought to have pursued by said company was practically in favor of other creditors in its tendency.

It was found that said company "was enabled to secure, and did secure, solely on account of the solvency and indorsement of said Kleinschmidt, credit upon which it could do, and did do, business;" and no doubt upon that finding was based the conclusion of law declared by the court, that Kleinschmidt "gave said corporation a credit wholly fictitious." This finding is hard to understand, in view of the nature of the action and the proof. If Kleinschmidt really stood in the attitude of an indorser or surety of plaintiffs' claims in the usual legal sense, that fact, ascertained, would fix the liability of Kleinschmidt to plaintiffs; and such liability would be direct, and not by way

of garnishment, or by way of setting aside an alleged fraudulent conveyance of property by the principal debtor.   If it was shown by proof that Kleinschmidt, by false representation or deceit, had misled plaintiffs into believing that he was responsible directly or collaterally for the indebtedness of said company, and thereby plaintiffs had been induced to give such credit, although in fact he stood in no such relation, said finding would then be applicable to the facts shown.   But no such facts as are premised in the above propositions are shown in this case, and no one so contends.   The language of that finding must not be given the usual legal significance of the terms used, but must rather be regarded as an expression of the conclusion of the court below that said company, or the members thereof engaged in its organization and operations, could not have embarked upon the transaction of said business except by the financial aid of Klein-schmidt — that except by such aid the members of said company would have been unable to organize and carry on said business; hence if such aid had not be been given, the business of Boesman Bros. & Co. never would have been commenced.   No such business having been commenced, there never would have been any transactions between said company and the plaintiffs in this action, by which credit was given.   Hence the aid of Klein-schmidt, thus remotely operating, was the cause of plaintiffs giving credit to Boesman Bros. & Co.   Such is the only interpretation which can reasonably be given to said finding, in the light of the case made out.   In that sense the finding under consideration may, or may not, be true.   At all events, it is not sufficient ground upon which to involve Kleinschmidt as surety or indorser for plaintiffs, nor as liable for plaintiffs' claims against said company, by reason of having wrongfully induced plaintiffs to give said company credit.   If Kleinschmidt had not aided the Boesman brothers in the commencement of their business undertaking, it is possible that some other party may have been found imprudent enough to have given such aid; and it is possible that such credit might have been given by plaintiffs if the same business had been commenced by the aid of some other party.   If, however, Kleinschmidt was the only person imprudent enough to aid said Boesmans to embark in business, that fact, if proved, would not be sufficient to bind

Kleinschmidt as surety for all credits which said company could obtain, or to bind him for having fraudulently enabled said company to obtain credit. In reviewing the testimony in view of the finding that said company secured credit "solely on the solvency and indorsement of Kleinschmidt," it would naturally be expected that some evidence would appear in the record tending to show that Kleinschmidt had in some way influenced plaintiffs to extend credit to said company, or that he had in some manner misled plaintiffs to believe that said company was a safe institution to credit by reason of his connection with it, directly or indirectly. But there is no evidence whatever tending in any degree to show any such fact. It does not appear whether or not the plaintiffs in this action, or any of them, who now seek to charge Kleinschmidt with having in some way defrauded them, ever sought from Kleinschmidt, or otherwise, information concerning the financial condition of said company; or information as to who could be looked to for payment in case it failed; or whether or not Kleinschmidt could be relied upon to aid said company in meeting its liabilities; or what amount Kleinschmidt held against said company, and would seek to secure in case it became financially embarrassed; nor is there any evidence tending to show that plaintiffs sought such information; or that it was withheld; or that any information, either misleading, false, or otherwise, was given by Kleinschmidt, or on his behalf. For aught that is shown, plaintiffs had knowledge of the exact condition of said company, its liability to Kleinschmidt, and all other facts which any party might wish in contemplation of giving credit; except that it is found that the agreement hereafter to be reviewed, evidenced by the paper introduced as "Exhibit C," "was kept secret between said Kleinschmidt and said Boesmans." But it nowhere appears in the evidence that plaintiffs ever sought information in respect to that agreement, or in respect to any other claims of Kleinschmidt upon said company, or arrangement between him and said company. That plaintiffs were in any manner misled or deceived into giving credit to said company, relying on the solvency of defendant Kleinschmidt, or on his indorsement of their claims against said company, there is no evidence whatever in the record to establish. Nor is there any evidence whatever in the

record tending to establish the fact that the effort of Klein-schmidt to keep himself fully informed of the condition of said company, to the end that he might secure payment of his claims, if possible, in any manner operated to deceive, influence, or mislead the plaintiffs in their dealings with said company.

It is set forth in findings 6 and 7 that "about the time said corporation was organized, defendant Kleinschmidt, as president of the Union Warehouse Company, and individually, entered into an agreement (Exhibit C) with the persons named as trustees in the certificate of incorporation, whereby it was agreed that any paper of said Union Warehouse Company, or of defendant Kleinschmidt, held against Boesman Bros. & Co., should become immediately due and payable if said Boesman Bros. & Co. should become involved, or be sued on any indebtedness, unless said Boesman Bros. & Co. would immediately secure Kleinschmidt;" and "that said agreement was kept secret between said Kleinschmidt and said Boesmans." Exhibit C, referred to, reads as follows: —

"HELENA, MONT. TY., Sept. 18, 1888.

"In consideration of Boesman Bros. & Co. having purchased from the Union Warehouse Company $5,000 worth of goods, I, Reinhold H. Kleinschmidt, as president of the Union Warehouse Company, and I, Reinhold H. Kleinschmidt, as an individual, agree to take their note for said amount on one year, drawing interest at the rate of ten per cent per annum, and payable semi-annually. After the expiration of the first year I agree to again renew the above transaction, so as to take their notes at six, twelve, eighteen, and twenty-four months in equal proportions, to draw interest at the rate of ten per cent per annum, payable semi-annually. In addition to this, I will loan to Mr. Charles Boesman, of the corporation, $2,000, on which he is to pay interest at the rate of ten per cent per annum, payable semi-annually, and secure the same by his stock in the corporation of Boesman Bros. & Co.

"It is also understood and agreed that any paper that the Union Warehouse Company or its president may hold against Boesman Bros. & Co. shall become immediately due, should they become involved, or be sued for any indebtedness that they may owe, unless they immediately secure me.

" Should Boesman Bros. & Co. at any time require indorsement in order to carry on their legitimate business, I will guaranty to either loan them additional funds over this, to the extent of $5,000, or, if I have no funds to loan, I will guaranty their account to the bank for $5,000.

"Interest in no case to be over ten per cent per annum; and, if I make the loan, they to arrange their rate with the bank.

(Signed,)          "REINHOLD H. KLEINSCHMIDT."

The court found as a legal conclusion that the making of said agreement, and afterwards the assignment, by said parties, operated as a fraud upon the creditors of said company. The agreement evidenced by Exhibit C appears to have been executed by Kleinschmidt only, and in it he promised to furnish said company a large sum of money, if required, by way of loan, in addition to merchandise; and along with this agreement is the provision, apparently as a promise on the part of said company or its members, that, in the event of said company becoming financially embarrassed, its obligations owing to Kleinschmidt and the Union Warehouse Company should become immediately due, unless said Boesman Bros. & Co. secured said claims. Although said agreement was signed by Kleinschmidt only, the testimony shows that there had been promises made by the members of Boesman Bros. & Co. to the same effect, and Kleinschmidt admits that when he returned from California, and advanced said company a loan of considerable amount to enable it to pay its overdraft at the bank, it is likely Boesman did say he would protect Kleinschmidt in the event of said company becoming financially embarrassed.

Did this agreement, taken in connection with the other facts in the case, and the subsequent assignment, operate as a fraud upon those who became creditors of said company? It is not shown whether said creditors knew or ever sought information as to said agreement. The finding states that said agreement "was kept secret between said Kleinschmidt and said Boesmans." Undoubtedly the great majority of agreements as to private affairs are in general kept secret between the parties thereto, and that fact could be asserted as to nearly all private agreements, not of such a nature as to require recording. There is no finding that said agreement was kept secret when inquiry

was made as to it, or as to any arrangements which Kleinschmidt might have with said company, by any party having a right to inquire concerning the same. Said agreement is dated September 18, 1888. This was just prior to the organization of, and commencement of business by said company. There is no evidence tending to show that it was antedated, or not made at the time of its date. The finding of the court is that said agreement was made about the time said corporation was organized, so that when made, considering all the other testimony, said company was commencing its career under no unfavorable circumstances, and it is not shown that it was then insolvent. Even taking it in the strongest light as a promise by said company, the condition of Exhibit C was in the alternative that the indebtedness should become immediately due unless immediately secured. The agreement was made when Kleinschmidt was in good faith loaning, and promising to further loan, considerable sums of money to said company, which the evidence shows he fulfilled, to enable it to pay its obligations.

Similar contracts have been under consideration in the courts. Mr. Waite, in his work on Fraudulent Conveyances (§ 394), says: "An agreement between a debtor and creditor that, in consideration of receiving a loan, the debtor will prefer such creditor in the event of insolvency, has been considered to be in the nature of a secret lien, which is a fraud upon subsequent creditors of the debtor who are ignorant of the arrangement, and all subsequent disposition of the property in accordance with such an arrangement can be avoided by such subsequent creditors. We doubt the soundness of this conclusion, however." In the above, reference is made to *Smith* v. *Craft*, 11 Biss. 340; 12 Fed. Rep. 856, in which it appears to have been held as stated by the author; but the same case appears afterwards to have been reconsidered, and a contrary view held. (17 Fed. Rep. 705.) In this treatment of the case it was said: "In no case or book cited has it been decided or said that merely because the borrower, at the time of procuring a loan or credit, had made an oral statement or promise that he would secure or prefer the one who gave such credit over others, he thereby disqualified himself from giving, and the creditor from receiving the promised favor; and I am not able to agree that

such is the law. If it be, then, instead of confining their prayer for relief to the goods in question, the plaintiffs might as well have asked that Fletcher and Churchman be held to account for all payments made to them upon their loans to Craft; for if the payment in goods was unlawful, payments in money were equally so, and, if necessary, should be brought under the same trust which it is sought to fasten upon the goods. Carried to its logical consequences, the doctrine contended for made it impossible that Fletcher and Churchman, as against the plaintiffs or other creditors of Craft in the same situation, could have lawfully accepted payment from Craft upon the loans which they made him, so long as he was unable to pay the plaintiff and like creditors in full; and this would be so, irrespective of the good faith of the parties, and notwithstanding the validity of the debt, its full consideration, and every other feature of merit, except only the fatal promise to prefer, the taint of which, once it had attached, it would seem, could in no manner be escaped. If it be the law that an express promise to secure or prefer a loan cannot be performed, it must be that an implied promise or tacit understanding would have the same effect; and whether or not there was such an understanding in each case, as it arises, must be a question to be determined usually upon circumstantial evidence. Upon such an inquiry, the personal and business connections, and even the social and domestic relations, of the parties might be deemed significant; and so the facts which afford the best motive for a proper preference might be converted into proof that the preference was given in consummation of an unlawful understanding or assurance given when the credit was obtained. Such a doctrine, if established, instead of constituting a healthful restriction upon the right of preference, would amount to a practical denial of the right in the cases wherein, if in any, it may be meritoriously exercised. I do not doubt that a promise to secure or to prefer a creditor, made at the time the credit is given, may be fraudulent, but it must be when a fraud is intended, or when the circumstances within the knowledge of the creditor are such that he must know that injury to others will probably result." The case was then taken to the Supreme Court of the United States. (*Smith* v. *Craft*, 123 U. S. 436.) In dismissing the

case, the court, by Mr. Justice Gray, said: "As the debtor might lawfully prefer one of his creditors, if there was no actual fraud, it cannot, in the absence of any finding upon that point, be said, as matter of law, either that the previous agreement to prefer was fraudulent, or that it was not; but the question of fraud or no fraud involved a question of fact, which, if this case had been on the common-law side of the court, and either party had desired it, must have been submitted to a jury. (*Bank of Leavenworth* v. *Hunt*, 11 Wall. 391; *National Park Bank* v. *Whitmore*, 104 N. Y. 297.)"

In the opinion of the court in the case of *Bank of Leavenworth* v. *Hunt, supra*, it is said: "In the second place, the supposed agreement, if established, was void as against other creditors of the bankrupts. It did not create any lien upon the property, or entitle the bank to any preference over other creditors in the event of the debtors being afterwards proceeded against under the bankrupt act. The subsequent sale, even if made in pursuance of the agreement, did not take effect by relation at its date. Transfers of personal property, situated as in this case, only take effect as against creditors from the delivery of the property to the purchaser."

So in the case of *National Park Bank* v. *Whitmore, supra*, the court said: "This agreement did not create any lien, legal or equitable, upon the property of the defendants. It was not an agreement for a future lien upon the specific property, which is sometimes held to create an equitable lien which may be enforced in equity. It was not an agreement for any lien at all. It was simply an agreement, in case of an assignment by the defendants, to prefer Whiting. The agreement did not bind defendants' property, nor encumber it, but left it subject to all the remedies of their creditors, and it neither hindered nor delayed those creditors. They could have made the same assignment without a previous agreement, and it is impossible to perceive how the agreement worked any legal harm to any one."

The opinion of the court in *Anderson* v. *Lachs*, 59 Miss. 115, is expressed to the same effect, as follows: "The appellant also contends that the deed is fraudulent in fact, because of an antecedent agreement between the assignor and Speed [the creditor], that, if at any time it should be necessary to execute the assign-

ment for Speed's protection, it should be done. The act itself of making the assignment being lawful, it is difficult to apprehend how a previous promise to do it can make it unlawful. If the debtor Hillyer could at any time lawfully execute the conveyance by which his property is devoted to the debt due to Speed, how are other creditors injured by the fact that he had previously promised on certain contingencies so to do? It is not admissible, from the fact alone that such precedent agreement was made, to infer the existence of a scheme devised for the purpose of entrapping others into sales of goods to the debtor, which goods were then to be by him appropriated to the payment of the debt of Speed. The law would not tolerate the consummation of such a scheme, but it does not, in the absence of proof, presume its existence."

Respondents cite *Blennerhassett* v. *Sherman*, 105 U. S. 116. In that case the point under consideration was not as to the debtor having made a prior promise to prefer a creditor in case of financial embarrassment. The question involved related to an actual conveyance, by way of mortgage of real estate of great value, having been made by the debtor, then insolvent to the knowledge of the mortgagee, which mortgage, by prearrangement, had been withheld from record by the mortgagees. That was one circumstance indicative of fraud, but not the only one. How far the case is distinguished from that at bar by the facts involved is shown by the following extract from the opinion of the court, expressed by Mr. Justice Woods, as follows: "There are several propositions of fact which, in our opinion, the evidence satisfactorily shows. . . . . *Fourth*, while the mortgage was thus kept from the record and from public knowledge, Stephens and Blennerhassett were busily engaged in sustaining the credit of Allen and the Cook County Bank, and, to accomplish their end, falsely and fraudulently represented him to be a man worth over a million of dollars, and of unlimited credit, and the Cook County Bank to be sound and good. *Fifth*, that by means of these representations of Stephens and Blennerhassett, and the concealment of the mortgage, and the withholding of it from the record, the creditors of Allen and the Cook County Bank were misled and deceived, and in consequence thereof they did, between the date and the

registration of the mortgage, deposit large sums of money in Allen's private bank at Des Moines, and in the Cook County Bank, and, at the instance of Stephens and Blennerhassett, discounted the paper of Allen and the Cook County Bank to a large amount, and that such deposits and discounts, though due, still remain unpaid." (See, also, *Fechheimer* v. *Baum,* 43 Fed. Rep. 719.)

We think such an agreement as that under consideration in the case at bar might in some cases become a material circumstance, proper for consideration, where a transaction was sought to be avoided on the ground of fraud. But in connection with such agreement there must be shown some fact or circumstance indicative of fraudulent intent on the part of the parties concerned. In the case at bar no such showing is made

There remains for consideration the question of the validity of said assignment as the act of said company. The main facts necessary to the consideration of this branch of the case have already been recited.

As heretofore observed, respondents contend that said assignment was invalid (1) because it was not authorized by vote or resolution of the stockholders or trustees of said corporation; (2) because Richard Boesman, who signed said instrument as secretary, was not secretary of said corporation, having never been regularly elected as such; (3) because the seal affixed to said instrument was not the corporate seal of said company, having never been regularly adopted as such.

It has been seen by the foregoing statement what said company was, as to the formation, control, operations, and ownership thereof. It was attempted in the formation of said company to put upon it the apparel or garb of a corporation as fashioned by the law of this State, and necessary to domestic corporate existence. In this undertaking the parties forming said company filed the usual certificate of incorporation, showing among other things its corporative stock, number of trustees, and names of those chosen for the first three months of said company's existence, etc. The capital stock was stated in the certificate at $10,000; and it appears from the evidence $4,000 worth of it was taken up, in the proportion of $2,000 worth to one of said brothers, and $1,000 worth to each of the

other two brothers.   That was all the stock ever taken by any one, and that was owned by those who had organized said company, and were actually in charge of its property, and operating its business.  It is shown that, after the organization of said company, a meeting was held by the so-called stockholders and trustees; and an election of officers of said company took place, whereby a president, secretary, and treasurer thereof were elected.   Thereafter, no regular meeting of stockholders or trustees, as of a corporation, was ever held, but all said stockholders and trustees were in charge of, and jointly managing, the business of said company themselves.   Nor was there any board of trustees ever elected to succeed those named in said certificate for the first three months; but the members of said board first named appear to have become a perennial board of trustees, if there was any, and they were trustees of their own property and affairs, of which they were personally in charge, because there were never any interests in said company owned outside of said three persons in charge; nor was there ever any further election of officers of said corporation held.   It is shown that Charles Boesman was, by the understanding and consent of the others interested, chosen general manager of the business of said company; but the other owners therein were present, co-operating in conducting its business, until Henry Boesman set up the branch business at Butte City.   Thereafter, and before the assignment in question was made, said Henry Boesman, as is proved without dispute, had severed his connection with said company, and had no interest whatever therein, leaving Charles and Richard Boesman in charge of said company, and sole owners of its property.   They were then two of the so-called board of trustees, and the entire owners, stockholders, proprietors, and managers of said institution.   No attempt was made to supply a third member of the board, although the statute requires three members.   (§ 450, div. 5, Comp. Stats.)   No statement was ever published or filed, as required by section 460, fifth division of the Compiled Statutes, and by such delinquency said trustees became jointly and severally liable in the dealings of said company with the world at large, the same as copartners.   It is clearly shown that to all intents and purposes, so far as third persons were concerned, said company had degen-

erated, if it ever had any fully developed corporate existence, into a mere joint proprietorship, with all the joint owners in actual charge and management of their own.

As to property interests, absolute and complete ownership and possession carry with them absolute power of disposition. If there are several distinct owners of portions of the whole, and all, without exception, join in the conveyance of the property, observing the rules of law applicable to the transfer of real or personal property, there can be no question that good title passes thereby. It is objected that said company had never kept its board of trustees renewed, and in full membership, as required by provisions of statute as to corportaions; nor had a regular meeting of stockholders or trustees been called and met and authorized said assignment; nor had the seal used been adopted as a corporate seal by resolution or by-law of the trustees of said company. These objections might be pertinent in many cases, where the parties doing an act stood solely in the capacity of an officer of a corporation, representing, as such, the interest of others not present, nor joining in the act; but these objections are all answered at once by the fact that the assignors were there acting as such by virtue of superior authority than that of agents or trustees, or president or secretary, or other officer. That authority was absolute ownership and possession, and the whole ownership was present, and joined in the act of assignment and delivery of said property, and it is not contended that there was any defect in said instrument as the assignment and delivery of such property by the owners thereof. If said assignment fails, it must fail on the ground of fraudulent intent in its execution, and as to that branch of the case we have seen that sufficient grounds for declaring it void on that score were not shown.

There are numerous exceptions in the record, and assignments of alleged error urged thereon by appellants, as to admission and exclusion of testimony, and otherwise, which we deem unnecessary to pass upon, having proceeded directly to treat the law and facts involving the merits of the action and the foundation upon which the judgment against appellant Kleinschmidt rests. There was no exclusion of any material testimony offered by plaintiffs in the trial of the action, after they amended their

complaint by permission of court. All material facts upon which plaintiffs seek judgment against Kleinschmidt appear to have been before the court, and brought into the consideration, both here and in the court below; and there having been numerous investigations in proceedings supplemental to garnishment and execution for discovery of all the facts and conditions in relation to the matters involved in this action prior to the commencement thereof, and our conclusion being that the judgment against Kleinschmidt should be reversed, because there is not sufficient grounds shown to sustain it, therefore, there appears to be no just reason to remand the case for a new trial. For these reasons we think the judgment should be reversed, and the cause be remanded, at the costs of respondents, with direction to the court below to enter judgment therein in favor of defendant Kleinschmidt, to the effect that plaintiffs take nothing by their action against him, and that he have and recover from plaintiffs his costs and disbursements therein expended; and it will be so ordered.

*Reversed.*

BLAKE, C. J. I concur.